File Date: _May 15, 2008_____

Case No: _07 cv 6475_____

ATTACHMENT # _____

EXHIBIT _____3_____

TAB (DESCRIPTION) _____

```
STATE OF ILLINOIS      )
                       )  SS:
COUNTY OF C O O K      )
```

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-CRIMINAL DIVISION

```
THE PEOPLE OF THE       )
STATE OF ILLINOIS,      )
                        )
        Plaintiff,      )
                        )
   vs.                  )    No. 99 CR 9919
                        )       00 CR 7104
CHARLES DANIELS,        )
                        )
        Defendant.      )
```

REPORT OF PROCEEDINGS of the hearing of the above-entitled cause, before the Honorable THOMAS DAVY, one of the Judges of said District, on the 5th day of June, 2002.

APPEARANCES:

> HON. RICHARD A. DEVINE,
> State's Attorney of Cook County, by:
> MR. EDWARD RONKOWSKI,
> Assistant State's Attorney,
>     appeared for the People;
>
> MR. DENNIS SHERMAN,
>     appeared for the Defendant.

THOMAS E. LIEF, CSR #084-000501
Official Court Reporter
10220 S. 76th Avenue
Bridgeview, Il. 60455

C   109

1          A.     No, sir.

2          Q.     Would you recognize that person if you

3     saw him again?

4          A.     Yes, sir.

5          Q.     Is he in court?

6          A.     Yes, sir.

7          Q.     Would you please point him out, describe

8     what he's wearing today?

9          A.     A white T-shirt and a tan short sleeve

10    cotton shirt.

11         MR. RONKOWSKI:  May the Record reflect in-court

12    identification of the defendant, Charles Daniels?

13         THE COURT:    Record may reflect that.

14         MR. RONKOWSKI:  Your witness.

15         THE COURT:    Cross-examine.

16                       CROSS EXAMINATION

17                       By Mr. Sherman:

18         Q.     Ms. Elston, on the date of February

19    12th, year 2000 you lived in the building at 8232

20    for approximately thirteen years?

21         A.     Thirteen, yeah.

22         Q.     It's a 3-story building?

23         A.     Yes, sir.

24         Q.     Three apartments on each side?

14

C  110

1        A.      Right.

2        Q.      And you said you saw the man come into

3    the building and you lose sight of the man when he

4    comes inside your building, right?

5        A.      Of course.

6        Q.      That's when you called the police?

7        A.      When I heard him at the mail box, yes.

8        Q.      At the mail box, which was right after

9    he came into the --

10       A.      Exactly.

11       Q.      Okay.  Called the police, police arrived

12   how long after you called them?

13       A.      I imagine between ten and fifteen

14   minutes.

15       Q.      It took them that long to get there?

16       A.      Right.

17       Q.      And the ten to fifteen minutes, where

18   were you?

19       A.      Inside my building.

20       Q.      At the same spot where you had been in

21   your living room looking out the window?

22       A.      Well, I didn't stay at the window all

23   the time.

24       Q.      But you didn't hear this person come up

16

C  111

1      the stairs, did you?

2            A.     No.

3            Q.     You didn't see the person leave out the

4      door?

5            A.     Yes, I saw him leave.

6            Q.     How long would you say he was in the

7      hallway of your building?

8            A.     I'd say three minutes.

9            Q.     Thirty minutes?

10           A.     Three minutes.

11           Q.     I'm sorry, three minutes.  And the

12     police arrived, at that time you looked -- did they

13     look around the building after the police arrived?

14           A.     Yes.

15           Q.     After the police left what happened?

16           A.     After the police left I decided to go

17     out and get my mail, and I had to pass the door of

18     the apartment that was vacant and I heard the bags

19     and so forth and somebody inside over there.

20           Q.     You heard rustling of the plastic?

21           A.     Exactly.

22           Q.     You went back into your apartment,

23     called the police again?

24           A.     Right.

17

C  112

STATE OF ILLINOIS    )
                     )  SS:
COUNTY OF C O O K    )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE            )
STATE OF ILLINOIS,           )
                             )
          Plaintiff,         )
                             )
vs.                          )    No. 00 CR 07104
                             )
CHARLES DANIELS,             )
                             )
          Defendant.         )

REPORT OF PROCEEDINGS  of hearing had before the Honorable THOMAS M. DAVY, on the 30th day of July, 2002.

APPEARANCES:

HON. RICHARD A. DEVINE,
   State's Attorney of Cook County, by:
MR. EDWARD RONKOWSKI,
   Assistant State's Attorney,

          appeared for the Plaintiff;

MR. DENNIS SHERMAN,

          appeared for the Defendant.

Patricia A. Grogan, CSR 084-001450
Official Shorthand Reporter
10220 South 76th Avenue
Bridgeview, Illinois 60455

C  113

1    THE CLERK:  Charles Daniels.

2    MR. SHERMAN:  For the record, my name is Dennis Sherman.

3 I represent Charles Daniels who is present before the Court.

4    At this time, Judge, we filed a motion for new trial,

5 actually we're asking for a finding of not guilty after a

6 finding of guilty, Judge.

7    We did present to the Court cases and we did show them

8 to the State also.

9    THE COURT:  All right, both sides prepared to proceed on

10 the argument on the motion for new trial?

11    MR. RONKOWSKI:  State is.

12    MR. SHERMAN:  Defense is ready.

13    THE COURT:  You may proceed, Mr. Sherman.

14    MR. SHERMAN:  Well, Judge, the evidence in the case

15 showed that, proved that the Defendant went inside the

16 residence, seen inside that residence,  took something

17 inside of that residence and in fact left.  That he was not

18 charged with residential burglary.  He was charged with

19 burglary.

20    The cases that I've given you show that burglary and

21 residential burglary are one mutually exclusive.  They are

22 not a lesser included.

23    One of them said that the legislation intended

24 residential burglary statute apply to burglary of a

17 2

C  114

1 structure intended for use as a residence regardless of

2 whether the structure was being actually used as a residence

3 at the time of the burglary.

4      That is People vs. Sexton, S-e-x-t-o-n.  You heard the

5 evidence this lady said I forgot either a four or six flat

6 building was occupied.  She lived there.

7      The people had moved out, but in fact there was no

8 testimony that she was doing that, this was not going to be

9 a dwelling place, therefore, we believe, Judge, also we

10 bring up Swain, S-w-a-i-n, also said which was a

11 nonoccupied second floor of the building which was under

12 going renovation was a dwelling place, here there was no

13 renovation going on, just vacant, Judge.

14      We believe Judge, not that the State proved the

15 Defendant guilty not of  burglary, but of residential

16 burglary since it is not a lesser included since they are

17 mutually exclusive.

18      The burglary cannot stand.

19      THE COURT:  Thank you, Mr. Sherman.  Mr. Ronkowski,

20 response?

21      MR. RONKOWSKI:  State would object to paragraph four,

22 lack of specificity.  As to Counsel's specific argument

23 today,  the State probably could argue, People vs.

24 Edelston, the case said the identical issue in the 2nd

1 District said the State called on which charge either way

2 was denied on that or the State can argue, the statutory

3 construction based upon the case is that Counsel has cited

4 where they interpreted the statute at the time that some how

5 a dwelling building, a home, is not a building.

6    It is like the Illinois Supreme Court saying that a cow

7 is a horse.  In fact, if you look at the statute, the

8 statute  has since been changed to correct that mistake and

9 that is no longer in there, but rather than argue those two

10 things, I would argue that the statutory definition of

11 dwelling that was in affect at the time the crime indicated

12 that a dwelling is a building even if the persons are not

13 actually residing there, if "absence is intended within a

14 reasonable period of time to reside."

15    Based upon the testimony of the victim, she didn't

16 live there.  She lived across the hall.  She never intended

17 to live in that apartment next door.

18    She owned the building. There is no testimony that any

19 owner intended to reside in that vacant apartment within

20 any reasonable period of time.

21    The testimony shows quite squarely that the Defendant

22 committed a burglary within the meaning of the statutory

23 definition that existed at the time of the crime.

24    So, based upon the testimony in the statute in

17 4

1 existence at the time, the Defendant quite clearly committed

2 a burglary and the Defendant's motion for new trial should

3 be denied.

4     MR. SHERMAN:  Judge, I think I guess they're citing 720

5 ILCS which says for residential burglary, a dwelling defines

6  a house, apartment, mobile home, trailer or other living

7 quarters in which at the time of the alleged offense the

8 owners or occupants actually resides, this woman did reside

9 in this building.

10     The apartment maybe one, but she says she saw this man

11 come inside this building.  This building is a residence.

12 She also said that in fact though there was nobody living

13 in the apartment that was next door to it, there was

14 nothing saying that she wasn't going to rent it out.

15 Nothing saying it was not going to be used as a residence,

16 so I believe, Judge, that in fact this was a residential

17 burglary, pure and simple and the State argues, I don't

18 think it goes to the fact that these two charges, burglary

19 and residential burglary are mutually exclusive.

20     They are not a lesser included and I believe, Judge, if

21 they're not a lesser included, then you should have found

22 the Defendant not guilty of burglary at the time.  Thank

23 you.

24     THE COURT:  Mr. Ronkowski, the definition you have for

175

C  117

1 dwelling wasn't that the same definition in fact at the time

2 the Supreme Court decision, People vs. Childress from 1994

3 which said that one of the cases cited by Mr. Sherman that

4 the two are mutually exclusive, residential burglary can be

5 committed only in a dwelling place while a simple burglary

6 cannot occur in a dwelling place.

7     MR. RONKOWSKI:  That maybe the case but Childress can be

8 distinguished based on the facts and if I can have a moment

9 to explain that, if I recall correctly, the crime occurred

10 inside the victim's dwelling.  This particular case the

11 victim testified she lived in one apartment, the Defendant

12 burglarized the unoccupied apartment.

13     The people that were supposed to be occupied that,

14 there is absolutely no testimony showing anybody intended

15 to, any owner of that apartment intended to reside in that

16 apartment in the near future and based upon her testimony

17 that this was an unoccupied apartment, it hadn't been

18 rented out and her testimony shows quite clearly it falls

19 within the statutory definition of a building based on that

20 definition that existed at the time.

21     Childress was a case involving statutory interpretation

22  on whether or not  burglary is a lesser included offense.

23     The Illinois legislature had reversed so to speak that

24 Childress' opinion by changing the statute.

*176*

C   118

1    Defense Counsel could not make that argument today

2 because the statute has been changed so that in affect calls

3 into question the Childress decision.

4    THE COURT:  What, the residential?

5    MR. RONKOWSKI:  Took out the offending language that

6 Counsel quotes about the charges being mutually exclusive.

7    Under current statute, specifically, the statute now

8 reads under residential burglary, this offense includes

9 the offense of burglary as defined under 19-1 that is

10 currently in the statute.

11    THE COURT:  When did that take affect?

12    MR. RONKOWSKI:  Makes no difference because--

13    THE COURT:  Why doesn't it make a difference, you can't

14 be charged with something in the statute in affect is the

15 one that was in affect on the date of the incident?

16    MR. RONKOWSKI:  What the Illinois legislature is

17 saying, if the Illinois Supreme Court misinterpretes are

18 intent, we're going to make it quite clear what our intent

19 was, but you don't even get to Childress.  It is strictly

20 what the law was at the time.

21    THE COURT:  What was the law at the time?

22    MR. RONKOWSKI:  The law at the time was if I could have

23 these back, if no owner intended to occupy that apartment

24 within a reasonable period of time, it is not a dwelling.

C  119

1 District case which discusses the Childress case which I

2 think had the Defendant been charged with the entry into a

3 specific apartment would still apply since there are

4 numerous cases that say a building is a dwelling if going to

5 intent to be used as a dwelling regardless of who would be

6 living there.

7       In any case, the Maskell case, it involved an apartment

8 building and one of the witnesses observed the Defendant

9 taking the TV set, pushing the TV set down the stairs of the

10 building that was entered through the front door and then

11 into the families apartment.

12      The Maskell case, page 84, unlike Childress and Borgen,

13 the  evidence in this case will allow the rational trier of

14 the fact find the Defendant made two unauthorized enteries.

15      These unauthorized enteries,  one into the building,

16 two in the apartment.  Moreover, the State does not dispute

17 that the stairwell of the building, the area of the

18 building that the Defendant entered when he entered the

19 building was not a dwelling place.

20      In this particular case, the testimony of Ms. Elston

21 was that she heard some noises at the entryway.  The

22 entryway, there was a common entryway into the apartment

23 where the mailboxes were at.

24      Entry was made apparently through there and through

C   120

1 that area the Defendant then entered the particular vacant

2 apartment.

3     So, I think under Maskell case in an apartment building

4 case unless the evidence would be that someone entered

5 directly into a particular apartment through a window or a

6 door leading directly from that apartment, from outside into

7 the apartment that as long as there is common area hallway,

8 stairway, or whatever, that entry into that building into

9 that common area would sustain the charge of burglary.

10     So, at this time, respectfully, motion for new trial is

11 denied.  I believe the parties agree we're going to proceed

12 on the presentence investigation was tendered on March 7th.

13     MR. RONKOWSKI:  Correct.

14     MR. SHERMAN:  Correct.

15     THE COURT:  Both sides prepared to proceed to

16 sentencing at this time?

17     MR. SHERMAN:  Yes.

18     MR. RONKOWSKI:  Yes.

19     THE COURT:  State, aggravation.

20     MR. RONKOWSKI:  Aggravation is listed quite eloquently,

21 in all of the Defendant's previous residential burglary

22 convictions in the PSI, Class X by priors and last sentence

23 of twelve years wasn't enough for him, the State would

24 recommend fifteen years mandatory consecutive.

C   121

1 It is not a dwelling.  It is a building and the owner of the

2 building did not intend to occupy that apartment.  She lives

3 next door.  It is an issue of statutory interpretation.

4    If she had leased that apartment out and the people

5 weren't home at the time, Counsel may have an argument, but

6 the owner testified I own the building, nobody was living in

7 that apartment.

8    It was vacant.  It is being renovated and falls clearly

9 within the provision where there is no owner intending to

10 occupy that vacant unit at the time.

11    So, you don't even get to the Childress decision.

12    MR. SHERMAN:  Judge, the charge against the Defendant

13 is that he without authority knowingly entered into the

14 building the property of Nora Elston, not an empty

15 apartment, but a building.  A building in which Nora Elston

16 owned and lived.

17    I find it hard to believe that is not a dwelling.  The

18 fact is there maybe a vacant apartment in that building

19 doesn't mean that if the Defendant goes inside that

20 building, it is owned with the intent to commit a theft.

21 That is residential burglary if somebody lives there and

22 Nora Elston did live there.

23    THE COURT:  Well, the case I think is directly on point

24 is People vs. Maskell, 304, Ill.App.3rd, 877, 1999 2nd

*178*

C   122

(Rev. 10 30 01) CCCR 0603

TO THE _Appellate_ COURT OF ILLINOIS
IN THE CIRCUIT COURT OF COOK COUNTY
CRIMINAL BUREAU

[TITL]E OF THE STATE OF ILLINOIS

Case No. _00 CR 7104_

Trial Judge _DAVY_

Court Reporter _____

_Charles Daniel_

Attorney _Dennis High Silerman_

Appeal Check Date _____

Appeal Bond _____

## NOTICE OF APPEAL

[Ap]peal is taken from the order or judgment described below:

[Appel]lant's Name: _Charles Daniels_

[Appel]lant's Address: _111 D.O.C._

[Appel]lant's Attorney: _____

[Addr]ess: _____

[Offen]se: _BURGLARY_

[Judg]ment: Guilty of _BURGLARY_ on a _bench trial_
_7-16-02_

[Sente]nce: _8 YRS 111 D.O.C_

[Date] Notice Filed: _9-9-2002_

_Charles Daniels by his trial Attorney_

_Appellant_

**VERIFIED PETITION FOR REPORT OF PROCEEDINGS AND COMMON LAW RECORD**

[Und]er Supreme Court Rules 605-608 Appellant ask the Court to order; (1) the Official Court Reporter to transcribe an [orig]inal and the copy of the proceedings, file the original with the Clerk and deliver a copy to the Appellant, or upon [Appe]llant's written request to the Appellant's attorney of record, and (2) the Clerk to prepare the Record on Appeal.

Appellant, being duly sworn, says that at the time of his/her conviction he/she was and he/she now is unable to [pay] for the Record or an appeal lawyer.

_____ Appellant

[SUB]SCRIBED and SWORN TO before me this _____ day of _____,

_____ Notary public

## ORDER

[IT] IS ORDERED; 1. _____

[ap]pointed as counsel on appeal, and 2. the record and Report of Proceedings be furnished appellant free.

| | | | | | |
|---|---|---|---|---|---|
| _6-5-0_ , _2002_ | _9.5_ , _2002_ | _____ , |
| _7-16_ , _2002_ | _____ , | _____ , |
| _7-30_ , _2002_ | _____ , | _____ , |

[DA]TE: _____, _____    ENTER: _____    C    123

[Ac]knowledge receipt:    Judge    Judge' No.

STATE OF ILLINOIS    )
                     )  SS:
COUNTY OF C O O K     )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE          )
STATE OF ILLINOIS,         )
                           )
         Plaintiff,        )
                           )
    vs.                    )      No. 99 CR 9919
                           )         00 CR 7104
CHARLES DANIELS,           )
                           )
         Defendant.        )

REPORT OF PROCEEDINGS of the hearing of the above-entitled cause, before the Honorable THOMAS DAVY, one of the Judges of said District, on the 5th day of June, 2002.

APPEARANCES:

HON. RICHARD A. DEVINE,
State's Attorney of Cook County, by:
MR. EDWARD RONKOWSKI,
Assistant State's Attorney,
    appeared for the People;

MR. DENNIS SHERMAN,
    appeared for the Defendant.

THOMAS E. LIEF, CSR #084-000501
Official Court Reporter
10220 S. 76th Avenue
Bridgeview, Il.  60455

C   124

1          THE COURT:   Both sides ready on Mr. Daniels?.

2          MR. RONKOWSKI:   One, I'm sure, possible

3     discovery violation.  After I do that I anticipate

4     both sides being ready.

5               There is no violation. Counsel, in fact,

6     has reviewed his notes. We'll be ready.

7          THE COURT:   Charles Daniels.

8          THE CLERK:   In custody, sheets two and five.

9                    (The following proceedings

10                   were had in the presence

11                   of the defendant:)

12         THE COURT:   Case 00 CR 7104, which is set for

13    indicated bench trial, both sides indicate they're

14    ready at least to commence the matter, apparently

15    there's a civilian witness in court?

16          MR. SHERMAN:   For the Record, my name is

17    Dennis Sherman.

18               Everything the Court says is correct.

19    I'm tendering at the present time the signed jury

20    waiver by the defendant who has advised me that he

21    wishes to be tried by a bench trial by your Honor.

22         THE COURT:   And Mr. Daniels, you understand

23    that you do have the right to a trial by way of a

24    jury trial. If you give up the right the case would

V-2

1    be heard before me by way of a bench trial.

2            A jury would be a trial before twelve

3    persons selected by you and your lawyer and by the

4    Assistant State's Attorney.  Jurors would be the

5    ones who would listen to the evidence, hear my

6    instructions on the law and the jurors would be the

7    ones to decide if the State had proven you guilty

8    beyond a reasonable doubt.

9            Do you understand that that's what a

10   jury trial is?

11       MR. DANIELS:   Yes, I do, your Honor.

12       THE COURT:   And this is your signature on the

13   jury waiver form giving up that right, sir?

14       MR. DANIELS:   Yes, sir.

15       THE COURT:   And has anyone forced you in any

16   way to give up your right to trial by jury?

17       MR. DANIELS:  No, they have not.

18       THE COURT:   Has anyone made any guarantees or

19   promises about what my finding might be on a bench

20   trial?

21       MR. DANIELS:  No, sir.

22       THE COURT:   I will accept the jury waiver

23   form.   There will be an order excluding witnesses

24   from both sides during the course of the trial.

V-3

C  126

```
1                    Does either side wish to make any

2        opening remarks?

3             MR. RONKOWSKI:   Waive.

4             MR. SHERMAN:   Waive.

5             THE COURT:   All right.

6                    State, you may call your first witness.

7             MR. RONKOWSKI:   Nora Elston.

8             THE COURT:   And if you would raise your right

9        hand to be sworn, please?

10                   (Witness sworn.)

11            THE COURT:   You may have a seat, ma'am.

12                   You may proceed, Mr. Ronkowski.

13            MR. RONKOWSKI:   Thank you.

14                   NORA ELSTON,

15       called as a witness on behalf of the People, having

16       been first duly sworn, was examined and testified as

17       follows:

18                   DIRECT EXAMINATION

19                   By Mr. Ronkowski:

20       Q.     State your full name.

21       A.     Nora Elston.

22       Q.     Spell your last name for the Court

23       Reporter, please.

24       A.     E-l-s-t-o-n.
```

C  127

1        Q.      And where do you live?

2        A.      8232 South Eberhart Street, Chicago.

3        Q.      That's in Chicago, Cook County,

4    Illinois?

5        A.      Yes, sir.

6        Q.      How long have you lived there?

7        A.      Fifteen years.

8        Q.      And who owns the building?

9        A.      I do.

10       Q.      Describe the building to the Judge.

11       A.      It's a 6-flat building, red in color,

12   four rooms on the 8234 side, five rooms on the 8232

13   side.

14       Q.      Now, where do you live in the building?

15       A.      Live on the first floor of 8232.

16       Q.      And where is 8234 South Eberhart in

17   relationship to where you live?

18       A.      Exactly across the hall.

19       Q.      And you're the owner of that unit also?

20       A.      Yes, sir.

21       Q.      Now, for the Record, how old are you

22   today, ma'am?

23       A.      Seventy-six.

24       Q.      Now, referring your attention to

V-5

C  128

1    February 12th of the year 2000 in the mid-afternoon,

2    around 3:40 in the afternoon were you at home?

3        A.    Yes, sir.

4        Q.    Was the apartment across the hall from

5    you at 8234 South Eberhart occupied at that time?

6        A.    No, sir.

7        Q.    What was the condition of the apartment

8    across the hall?

9        A.    The condition was that no one was there

10   because the occupant had moved out, but I had moved

11   some of my things across the hall because I was

12   going to do some work in my building, I was trying

13   to get them out of the way temporarily.

14       Q.    What items did you move into that unit?

15       A.    I know I moved a radio, some tapes and

16   some clothing.

17       Q.    When you were last in the apartment

18   across the hall what condition did you leave it in?

19       A.    I'm not sure I understand your question.

20       Q.    Was it locked up that afternoon?

21       A.    Yes, it was locked.

22       Q.    And your property was still inside?

23       A.    Yes, sir.

24       Q.    At 3:40 in the afternoon on February

V-6

C   129

1    12th, what happened?

2         A.    I was in my apartment in the living room

3    looking out the window and I saw a gentleman come up

4    the street and turn into my walkway, and I could

5    hear the bell ring at the 8234 apartment, and then I

6    heard this fumbling with the mail box, sounded like

7    pulling it open.

8         Q.    Now, when you saw this gentleman come up

9    your driveway or walkway, were you looking out the

10   window?

11        A.    Yes, sir.

12        Q.    How close were you able to get to see

13   him?

14        A.    Between ten to thirteen feet.

15        Q.    About how tall would you estimate that

16   person to be?

17        A.    About a little over six foot.

18        Q.    And about how much did you estimate that

19   person to weigh?

20        A.    I imagine about one eighty.

21        Q.    How was the person dressed?

22        A.    He had on a jacket and a hat.

23        Q.    Now, that person rang the doorbell of

24   the unoccupied apartment?

V-7

1       A.      Right.

2       Q.      What did you do?

3       A.      Well, I wondered what, you know -- what,

4    you know, why he rang it if nobody lived there.

5       Q.      Then what happened?

6       A.      And then he came out and when he came

7    out I thought he was gone, but anyway I called the

8    police when I heard him fool with the mail box.

9       Q.      Did the police come out?

10      A.      Yes, they did.

11      Q.      Then what happened?

12      A.      Then I told them, I said well, he was

13   here but he's gone now.  Then I decided, well, I

14   would go out and get my mail and when I went out I

15   heard him in the apartment because it was right

16   across the hall from me.

17      Q.      Were the police still there when you

18   herd somebody in the basement apartment?

19      A.      No, no, I had to call them a second

20   time.

21      Q.      What sort of noises did you hear coming

22   from the vacant apartment?

23      A.      Well, I had plastic bags over there and

24   I could hear the bags rattling.

V-8

C   131

1        Q.      Did anybody have authority to be inside

2    your vacant apartment at that time and place?

3        A.      No, sir.

4        Q.      After you heard somebody inside your

5    vacant apartment that afternoon what did you do

6    next?

7        A.      I went back and called the police again

8    and I told them that I thought he was gone but he's

9    in the apartment.

10       Q.      Then what happened?

11       A.      Then they came back.

12       Q.      Did you see anybody leave that area?

13       A.      Yes.  I saw the gentleman leave and he

14    had some of my packages in his hands.

15       Q.      Was this the same gentleman you had seen

16    come up your walkway earlier?

17       A.      Exactly the same person, yes.

18       Q.      Would he be about the same height and

19    weight that you observed?

20       A.      Right.

21       Q.      Wearing the same clothing?

22       A.      Right.

23       Q.      And he was leaving your premises with

24    something?

V-9

C  132

1        A.      Right.

2        Q.      Tell us what he was leaving with.

3        A.      He had some plastic bags in his hands.

4        Q.      How big were these plastic bags in his

5    hands?

6        A.      I would say about two by three, or two

7    and a  half by three and a half.

8        Q.      Would this be --

9        A.      Feet.

10       Q.      Feet?

11       A.      Uh-huh.

12       Q.      Two and a half by three feet?

13       A.      Uh-huh.

14       Q.      Is that a "yes"?

15       A.      Yes, sir.

16       Q.      Thank you.

17               And that's when you called the police

18   again?

19       A.      No, I didn't call them right away

20   because I wanted to see -- let's see, did I call the

21   police?  Yeah, I called the police, and then when I

22   -- I said well, I'll go and se where he's going,

23   because I thought maybe if I saw him go in a

24   building at least I'd know where to tell them he

1      went.

2            Q.     So what did you do then?

3            A.     I followed him and he went down the

4      alley.

5            Q.     What distance did you follow him?

6            A.     I followed him approximately twenty to

7      twenty-five feet away from me.

8            Q.     Then did you see which direction he was

9      going?

10           A.     Yeah, I saw what direction.

11           Q.     Which direction was that?

12           A.     He was going west in the alley, and then

13     he turned north.

14           Q.     Did he still have your property at that

15     time?

16           A.     Well, he had as long as I could see him,

17     but when he turned the corner then by the time I got

18     to that corner, then he didn't have -- I didn't see

19     it.

20           Q.     How far behind him do you think you

21     were?

22           A.     From twenty to twenty-five feet.

23           Q.     Then what did you do?

24           A.     Then I thought, well, I'll go back home,

V-11

C  134

1    and that's what I did.

2        Q.    Did the police finally arrive again?

3        A.    Right, they did arrive again.

4        Q.    And did you tell the police officers

5    what you saw and what happened?

6        A.    Yes, I did.

7        Q.    Did you go with the police anywhere?

8        A.    They told me to get in the car and they

9    were going to see if they saw him, or if we saw him.

10       Q.    And did you go in the direction that you

11   told the police you saw him go?

12       A.    Down the same alley, yes, sir.

13       Q.    What happened?

14       A.    We saw him a block away.

15       Q.    And what happened then?

16       A.    Well, they got out and went to talk to

17   him. I stayed in the car while they talked to him.

18       Q.    Did you identify that person to the

19   police?

20       A.    Yes, I did.

21       Q.    What did you say to the police about the

22   person that you saw?

23       A.    I said, "There he is right there."

24       Q.    And that's the same person you had seen

V-12

C   135

1    going into your building?

2        A.    Right.

3        Q.    And is that the same person that you saw

4    leaving your building?

5        A.    Yes, sir.

6        Q.    And you identified him to the police?

7        A.    Yes, I did.

8        Q.    Did the police recover anything?

9        A.    Yes, they did.

10       Q.    Describe what you observed the police

11   recover.

12       A.    I saw -- well, they got the bags from

13   him, I don't know what they said but they got the

14   bags and they brought them to me, he said, "Is this

15   your belongings?"  And I said, "Yes, they are.

16       Q.    What did the police display to you?

17       A.    They displayed to me some tapes, some

18   radio, some panty hose and other clothing.

19       Q.    Where had you last seen those items?

20       A.    In the apartment at 8234.

21       Q.    And you never gave that person

22   permission to enter that vacant apartment of yours?

23       A.    No, sir.

24       Q.    Or permission to remove your property?

C   136

1        A.      No, sir.

2        Q.      Would you recognize that person if you

3   saw him again?

4        A.      Yes, sir.

5        Q.      Is he in court?

6        A.      Yes, sir.

7        Q.      Would you please point him out, describe

8   what he's wearing today?

9        A.      A white T-shirt and a tan short sleeve

10  cotton shirt.

11       MR. RONKOWSKI:  May the Record reflect in-court

12  identification of the defendant, Charles Daniels?

13       THE COURT:   Record may reflect that.

14       MR. RONKOWSKI:  Your witness.

15       THE COURT:   Cross-examine.

16                  CROSS EXAMINATION

17                  By Mr. Sherman:

18       Q.      Ms.  Elston, on the date of February

19  12th, year 2000 you lived in the building at 8232

20  for approximately thirteen years?

21       A.      Thirteen, yeah.

22       Q.      It's a 3-story building?

23       A.      Yes, sir.

24       Q.      Three apartments on each side?

**V-14**

1        A.      Yes, sir.

2        Q.      So it's a 6-flat, right?

3        A.      Right.

4        Q.      How many of those apartments were vacant

5    on the date of February 12th year 2000?

6        A.      One.

7        Q.      You were going to rent it again, is that

8    correct?

9        A.      Correct.

10        Q.      You weren't doing any rehabbing on that

11    apartment, right?

12        A.      Not at the present time.

13        Q.      You were just going to just put some of

14    your belongings there for storage, but you were

15    going to rent that apartment?

16        A.      Eventually, right.

17        Q.      It was habitable?

18        A.      Of course.

19        Q.      And on the date it just so happened that

20    you were looking out the window and you saw this

21    man, is that correct?

22        A.      Exactly.

23        Q.      Just happenstance, you weren't checking

24    the window or anything?

1       A.      Right.

2       Q.      And you said you saw the man come into

3   the building and you lose sight of the man when he

4   comes inside your building, right?

5       A.      Of course.

6       Q.      That's when you called the police?

7       A.      When I heard him at the mail box, yes.

8       Q.      At the mail box, which was right after

9   he came into the --

10      A.      Exactly.

11      Q.      Okay.  Called the police, police arrived

12  how long after you called them?

13      A.      I imagine between ten and fifteen

14  minutes.

15      Q.      It took them that long to get there?

16      A.      Right.

17      Q.      And the ten to fifteen minutes, where

18  were you?

19      A.      Inside my building.

20      Q.      At the same spot where you had been in

21  your living room looking out the window?

22      A.      Well, I didn't stay at the window all

23  the time.

24      Q.      But you didn't hear this person come up

C   139

1    the stairs, did you?

2        A.    No.

3        Q.    You didn't see the person leave out the

4    door?

5        A.    Yes, I saw him leave.

6        Q.    How long would you say he was in the

7    hallway of your building?

8        A.    I'd say three minutes.

9        Q.    Thirty minutes?

10       A.    Three minutes.

11       Q.    I'm sorry, three minutes.  And the

12   police arrived, at that time you looked -- did they

13   look around the building after the police arrived?

14       A.    Yes.

15       Q.    After the police left what happened?

16       A.    After the police left I decided to go

17   out and get my mail, and I had to pass the door of

18   the apartment that was vacant and I heard the bags

19   and so forth and somebody inside over there.

20       Q.    You heard rustling of the plastic?

21       A.    Exactly.

22       Q.    You went back into your apartment,

23   called the police again?

24       A.    Right.

$$\left( R.\text{V-17} \right)$$

1          Q.     And how long would you say it was after

2     you called the police the second time that you say

3     you saw the man leave the apartment?

4          A.     I imagine about seven minutes.

5          Q.     And when you left the apartment he had

6     something in his hands?

7          A.     Exactly.

8          Q.     What was that?

9          A.     Plastic bags.

10         Q.     What color, if you can recall?

11         A.     Black, I believe.

12         Q.     Did you have black plastic bags in that

13    apartment --

14         A.     Yes, sir.

15         Q.     (Continuing) -- that you were keeping

16    your stuff in?

17         A.     Yes, sir.

18         Q.     When he had this plastic bag did he

19    carry it over his shoulder, in his hands?

20         A.     In his hands.

21         Q.     In his hands.  And when he left did he

22    go out the front door or the back door?

23         A.     The front door.

24         Q.     You at that time decided to see where he

V-18

1    was going?

2         A.    Right.

3         Q.    He then went in the -- I thought you

4    said he went westbound in an alley?

5         A.    Exactly.

6         Q.    Which alley would that be next to, if

7    it's westbound, Eberhart goes north and south,

8    right?

9         A.    Eberhart goes north and south, there's

10   an alley that cuts between the block, about two --

11   it's a big building there at the corner, there's an

12   alley exactly beside it.

13        Q.    So you must be at like 82nd Place or

14   82nd Street what would it be?  What's the corner

15   where your building is at?

16        A.    83rd Street.

17        Q.    Pardon me, 82nd Street?

18        A.    83rd Street.

19        Q.    83rd Street. Okay. And that alley is

20   just north of 83rd Street?

21        A.    Right.

22        Q.    You followed him out, you then turned

23   north --

24        A.    Exactly.

C   142

1          Q.      (Continuing) -- in that alley, that goes

2      right behind Eberhart, correct?

3          A.      Right.

4          Q.      How far did you follow him up that

5      alley?

6          A.      I didn't follow him up the alley.

7          Q.      So you don't know where he went from

8      when you lost sight of him when he turned north?

9          A.      I saw him.  But he didn't have my bags,

10     he was gone, he was gone with the bags somewhere,

11     but I saw him, no bags.

12         Q.      You saw this man without a bag --

13         A.      Exactly.

14         Q.      And where did you see him, that man

15     without the bag?

16         A.      About fifty feet away from me.

17         Q.      Was it in the alley?

18         A.      Yes, sir.

19         Q.      Which way was he walking, if he was

20     walking?

21         A.      Well, he wasn't walking, he was standing

22     there.

23         Q.      You then I believe went back home and

24     the police arrived?

C   143

1        A.      Yeah, the police arrived when I was on

2    my way back to my house.

3        Q.      You then told them whatever you told

4    them, you got in the car, they went down and went up

5    that alley?

6        A.      Exactly.

7        Q.      When they went up the alley, that's

8    where you say they saw this man?

9        A.      Right.

10       Q.      The same man?

11       A.      Uh-huh.

12       Q.      But this time he had bags on him then?

13       A.      I didn't say he had bags on him.

14       Q.      Well, when the police -- when you got in

15   that car and they drove up the alley and you saw

16   that man, was he standing in the same spot he had

17   been standing when you last saw him?

18       A.      No, sir.

19       Q.      Where had he moved to?

20       A.      He had moved to Vernon, the street

21   behind Eberhart.

22       Q.      Is Vernon the next street --

23       A.      Yes, sir.

24       Q.      Is it east or west of Eberhart, Vernon?

V-21

C   144

1     A.     It's west of Eberhart.

2     Q.     So he was no longer in that alley, he

3   was now on Vernon?

4     A.     Right.

5     Q.     Was he on the street or in the alley on

6   Vernon?

7     A.     Street.

8     Q.     What, if anything, did you see the

9   police do when they stopped the vehicle?

10     A.     I saw them go over and talk to him.

11     Q.     What happened after they talked with

12   him?

13     A.     They -- I don't know what they said but

14   anyway he produced the bags from somewhere and they

15   brought them and asked me was this my belongings.

16     Q.     When you say he produced the bags from

17   somewhere, somewhere on his person?

18     A.     I don't know.  When I was in the police

19   car they went to talk to him.

20     Q.     Could you see what they were -- could

21   you see that?

22     A.     I could see them talking to him.

23     Q.     Okay.

24     A.     Uh-huh.

C  145

1      Q.    Did you then see him somehow leave your

2  view?

3           Do you understand the question?

4      A.    No, I don't understand what you mean.

5      Q.    When the police were talking to this man

6  you could see them, correct?

7      A.    Right.

8      Q.    You say they somehow produced a bag.

9  Did they leave your sight?

10     A.    I think he left the sight, not the

11  police.

12     Q.    He left.  This man just walked away from

13  the police officers?

14     A.    I believe so.  All I know is they

15  brought me the bags that he had taken with my

16  belongings.

17     Q.    But when the police arrested him is it

18  your testimony he didn't have any bags on him?

19     A.    I didn't see any bags.  Now, whether he

20  had them or not I don't know.

21     Q.    How large of a bag were they that you

22  saw this man take?

23     A.    About two and a half by three and a half

24  feet.

C   146

1    Q.    Two and a half by three and a half feet?

2    A.    Yes, sir.

3    Q.    They're pretty large sized bags?

4    A.    Exactly.

5    Q.    So it's not easily -- so those type of

6    bags are not easy to secrete on your body, are they?

7    A.    No, sir.

8    Q.    So you didn't see -- and when this man

9    was carrying it you never saw him put it on any part

10   of his body, correct?f

11   A.    Correct.

12   Q.    And you didn't see the police at any

13   time when they had this man in your view pat him

14   down or search him and produce these bags, is that

15   correct?

16   A.    Well, I didn't think it was my job to

17   watch them after they got him; that was their job.

18   Q.    So you didn't see that?

19   MR. RONKOWSKI:  Objection, asked and answered.

20   THE COURT:    Overruled.

21   MR. SHERMAN:  Withdraw the question.

22        Now, the door to the next apartment,

23   that first floor, was there a lock on that door?

24   THE WITNESS:    Yes, sir.

C   147

1          Q.     Was there a lock on the back door?

2          A.     Yes, sir.

3          Q.     Were there any -- were there windows in

4     that apartment?

5          A.     Yes, sir.

6          Q.     Obviously windows.   Were they all shut

7     and locked?

8          A.     No, sir.

9          Q.     Were they open?

10         A.     One of them had to be open for him to

11    come in.

12         Q.     And when you made an inspection of that

13    apartment the doors were still locked, correct?

14         A.     Correct.

15         Q.     You said one of the windows was open?

16         A.     I said one of the windows was not

17    locked.

18         Q.     Was not locked, but all -- you locked

19    all those windows inside that apartment?

20         A.     I thought I did, but I guess I didn't.

21         Q.     Ms. Elston, when the police arrived the

22    first time did you ever go and look inside the

23    building to see -- strike that.

24                When the police arrived the first time

C   148

1       did they go inside your building?

2              A.      No, they didn't.

3              Q.      So you never checked this first floor

4       apartment next door to you to see if anybody was in

5       it and the police didn't the first time they

6       arrived?

7              A.      Well, when the police arrived they went

8       in my back yard and looked around.  Now, as I said,

9       the door was locked, they looked at the door, tried

10      it, it was locked, so they left because we assumed

11      the gentleman had gone.

12             MR. SHERMAN:  Okay.  Thank you.  I have

13      nothing further.

14             THE COURT:  Redirect?

15             MR. RONKOWSKI:  Not by the State.

16             THE COURT:  Thank you, Ms. Elston.  You may

17      step down. Thanks for coming to court.

18             THE WITNESS:  Okay.

19                          (Witness excused.)

20             MR. RONKOWSKI:  Judge, I should have only two

21      other witnesses, Officer Meister, who had apparently

22      the subpoena did not catch up to him because he

23      moved districts.  I do have the current district.

24      And Detective Colisari, who took the defendant's

C    149

1      statement, whose normal day off is today. I called

2      the area and they expect him back in a couple of

3      days.

4                  Whatever date is convenient for counsel,

5      if we can commence and continue to my final

6      witnesses for the State to rest.

7          MR. SHERMAN:   If you give me some dates,

8      Judge, when you are open I'll be glad to.

9          THE COURT:   You have Mr. Sherman, the Brookins

10     case on Monday.

11         MR. SHERMAN:   I know.

12         THE COURT:  As far as both sides, is that going

13     to go?

14         MR. RONKOWSKI:   It's set for 1:00 o'clock

15     anticipate starting the case out of order for

16     scheduling purposes with the doctor.   I have been

17     told by my office they want me free by I think  it's

18     3:00 or 3:30, because Mr. Devine, the State's

19     Attorney, wants to speak to all the Assistant

20     State's Attorneys.  So I would resist putting it on

21     that afternoon.

22         THE COURT:   No, I was thinking if Brookins was

23     not going we could set it --

24         MR. RONKOWSKI:  No, Brookins is going.  I

                          V-27

C   150

1    definitely want to call the doctor, mentioned to you

2    that one --

3        THE COURT:    All right.

4        MR. SHERMAN:    I was going to have my doctor

5    here also. I thought maybe we could get rid of both

6    doctors at one time, but if you're only going to be

7    here till 3:30 --

8        THE COURT:    I'm willing to work until I've

9    been yanked upstairs.

10        MR. SHERMAN:    Okay.

11        THE COURT:    Mr. Devine can always come down

12    here and watch Mr. Ronkowski work.

13        MR. RONKOWSKI:    I won't last till March 31st if

14    that happens.

15        MR. SHERMAN:    So that date is out.  I'm

16    happier to be here in the building on the 13th, got

17    a bunch of cases on that date.

18            How about the 19th?  Going to be in the

19    building on the 19th, on the 17th, be here on the

20    17th and the 19th.

21        THE COURT:    Mr. Sherman, I think you already

22    have two things set.

23        MR. SHERMAN:    Yeah.

24        THE COURT:    Juan Vega and Mendoza.

**V-28**

1          MR. SHERMAN:  Correct.

2          THE COURT:   Want to try it the 19th?

3          MR. SHERMAN:  Yes.

4          THE COURT:   Trial commenced, continued 6/19,

5     and I will stay the mittimus on Mr. Daniel's other

6     case to that date as well, in the middle of trial.

7          MR. SHERMAN:  Judge, would you sign an order so

8     the defendant can go to the law library?

9          THE COURT:   Certainly.

10                         (Hearing in the above-entitled

11                          matter continued to 6/19/02.)

12

13

14

15

16

17

18

19

20

21

22

23

24

C   152

STATE OF ILLINOIS      )
                       )  SS:
COUNTY OF C O O K      )


I, THOMAS E. LIEF, Official Shorthand Reporter of the Circuit Court of Cook County, Criminal Division, do hereby certify that I reported in shorthand the evidence had in the above-entitled cause and that the foregoing is a true and correct transcript of all the evidence heard.


_____
Official Shorthand Reporter
#084-000501
Circuit Court of Cook County
Criminal Division
10/14/02.


V-30

C    153

```
STATE OF ILLINOIS      )
                       )   SS:
COUNTY OF C O O K      )
```

     IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
      FIFTH MUNICIPAL DISTRICT- CRIMINAL DIVISION

```
THE PEOPLE OF THE          )
STATE OF ILLINOIS          )
                           )
          vs.              )      No. 00-CR-7104
                           )
CHARLES DANIELS            )
```

                    BENCH TRIAL

                         REPORT OF PROCEEDINGS
held in the Bench Trial of the above-entitled
cause, before the Honorable THOMAS M. DAVY, on the
19th day of June, 2002.

        PRESENT:

        HONORABLE RICHARD A. DEVINE,
             States Attorney of Cook County, by
        MR. ED RONKOWSKI,
             Assistant State's Attorney
             on behalf of the People;

        MR. DENNIS SHERMAN,
             on behalf of the Defendant.


Reported by:
LEONA RILEY, CSR
Official Court Reporter
10220 S. 76th Avenue
Bridgeview, Illinois    60455

                    W-1

                              C   154

1                          I N D E X

2

3    Date of Hearing:              June 19, 2002

4

5    Page Numbers:              W-1  to  W-5

6

7                          PROCEEDINGS

8

9    LIST OF WITNESSES          DX   CX   RDX   RCX   RDX

10      Continuance              3

11

12

13

14

15

16

17

18

19

20

21

22

23

24

W-2

C 155

1        THE CLERK:   Charles Daniels.

2        MR. SHERMAN:   For the record Dennis Sherman

3    representing Mr. Daniels.   This is a trial

4    commenced and continued from June 6th, was the

5    date.

6        MR. RONKOWSKI:   Counsel and I had an informal

7    discussion concerning scheduling for the reasons

8    previously enunciated.   The State is asking to

9    commence and continued, motion state to July

10   16th.   Counsel indicates that would be good for

11   his schedule.

12       MR. SHERMAN:   That's correct.

13       MR. RONKOWSKI:   This one is going to take

14   priority for two reasons.   Number one, the

15   defendant is in custody.

16       THE COURT:   Just commenting.

17       MR. SHERMAN:   You told him there were four.

18       THE COURT:   I can squeeze yet another trial.

19       MR. RONKOWSKI:   You have how many?

20       THE COURT:   Helm, Purdy Washington.

21       MR. RONKOWSKI:   How about Wilford Gatlin.

22       THE COURT:   I have that for the 15th.   We can

23   work that out later.   Motion state, 7-16.

24       MR. SHERMAN:   To complete trial.

W-3                        C   156

1      THE COURT:  To complete trial.  Okay.  The

2  stay of mitt will be extended on the other matter.

3      MR. SHERMAN:  Thank you, Judge.

4              (The above-entitled cause was

5              continued to July 16, 2002,

6              at 9:30 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

W-4

C  157

STATE OF ILLINOIS    )
                     )  SS:
COUNTY OF C O O K    )

   IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
    FIFTH MUNICIPAL DISTRICT- CRIMINAL DIVISION


            I, LEONA RILEY, an Official Court

Reporter for the Circuit Court of Cook County,

Fifth Municipal District, Criminal Division, do

hereby certify that I reported in shorthand the

proceedings had at the Bench Trial of the

aforementioned cause; that I thereafter caused the

foregoing to be transcribed into typewriting,

which I hereby certify to be a true and accurate

transcript of the Report of Proceedings held

before the Honorable THOMAS M. DAVY, Judge of said

court.




                      _____
                 Official Court Reporter


   Dated this 5th day of October, 2002



W-5

C   158

STATE OF ILLINOIS    )
                      ) SS:
COUNTY OF C O K     )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-CRIMINAL DIVISION

| | |
|---|---|
| THE PEOPLE OF THE<br>STATE OF ILLINOIS,<br><br>    Plaintiff,<br><br> vs.<br><br>CHARLES DANIELS,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)   No. 99 CR 9919<br>)       00 CR 7104<br>)<br>)<br>) |

REPORT OF PROCEEDINGS of the hearing of the above-entitled cause, before the Honorable THOMAS DAVY, one of the Judges of said District, on the 16th day of July, 2002.

APPEARANCES:

        HON. RICHARD A. DEVINE,
        State's Attorney of Cook County, by:
        MR. EDWARD RONKOWSKI,
        Assistant State's Attorney,
            appeared for the People;

        MR. DENNIS SHERMAN,
            appeared for the Defendant.

THOMAS E. LIEF, CSR #084-000501
Official Court Reporter
10220 S. 76th Avenue
Bridgeview, Il. 60455

C 159

1    THE COURT:  Charles Daniels.

2                      (The following proceedings

3                      were had in the presence

4                      of the defendant:)

5    THE COURT:  All right. This is a commenced and

6    continued matter.  Both sides are ready to resume at

7    this time.

8    MR. RONKOWSKI:  I'd like to call Detective

9    Carlasasare.

10    MR. SHERMAN:  Prior to calling the detective,

11    Judge, I would advise the Court that just -- I did

12    receive discovery, additional discovery, if I may

13    just get it -- actually when I went to talk to the

14    defendant I gave it to him.

15                      (Short pause.)

16    MR. SHERMAN: Judge, on July the 9th I was faxed

17    a copy of a police report that had been made on July

18    10th, years 2000, first notice that I had been

19    given.  We have been asking for a police report, as

20    you can see the case is two years old already and

21    this matter's on trial.  State has advised me,

22    however, that they are only going to introduce

23    testimony that was available on the felony review

24    notes as to the statement of the defendant.

X-2

C   160

1          I certainly don't believe that Mr.

2     Ronkowski in any way, shape or form hid this,

3     knowing Mr. Ronkowski, and even though I know he is

4     a wealthy man with certain problems, Judge, he's

5     still a State's Attorney and I know that he would

6     not secrete this.  It just seems to me there's

7     something going on that I can't get a police report

8     two years -- for two years until finally when the

9     officer's getting ready to testify I get a copy of

10    his police report.

11         THE COURT:   The Record should not, if the case

12    goes up on appeal, that the comment as to Mr.

13    Ronkowski's wealth were made tongue in cheek.

14         MR. SHERMAN:   Sorry, I shouldn't say anything

15    about him being wealthy, that's not right.

16         THE COURT:   On the cold Record it might look

17    like something, the comments about his wealth --

18         MR. RONKOWSKI:   It's somewhat inaccurate

19    because the way the State's Attorney pays me, I have

20    no personal wealth in income.

21         THE COURT:   Mr. Ronkowski --

22         MR. RONKOWSKI:   If I can respond with less

23    editorializing --

24         THE COURT:   Yes.

                         X-3

                                    C  161

1          MR. RONKOWSKI:   (Continuing) -- on the

2     arraignment date counsel was given a copy of the

3     felony review notes.  Within an hour of me receiving

4     the detective sup that both of us wanted on the last

5     date, I faxed it to counsel, which fleshed out other

6     areas which the detective did.  All I'm seeking to

7     do is question the detective concerning his

8     conversations with the defendant.

9               Counsel has both the felony review notes

10     that shows sum and substance the conversation and

11     now the detective sup.  So while he may be surprised

12     at some of the other stuff, there should be no

13     surprise as to the defendant's statement.

14               Ask to proceed accordingly.

15          THE COURT:   And as far as you described it,

16     "the other stuff," you are not going into that, is

17     that correct?

18          MR. RONKOWSKI:   No.  If counsel wants to go

19     into it, he's free to --

20          THE COURT:   No, you, Mr. Ronkowski.

21          MR. RONKOWSKI:   No.

22          THE COURT:   Are you going to go into it on

23     direct?

24          MR. RONKOWSKI:   No.

                         X-4

C   162

1        THE COURT:   Thank you.  And I suppose that in

2     an intellectual exercise, any idea why the detective

3     supplement was, 2000 case, was not received until

4     the middle of 2002?

5        MR. RONKOWSKI:   It was ordered up the day after

6     the arraignment and for some reason we never got it,

7     and with the delay involved with the defendant's BCX

8     we did not catch the mistake, either side, until

9     after the trial had started.  My culpability.

10       THE COURT:   With the representatIon by the

11    State they will not go into "other stuff," in

12    parenthesis, does that resolve the issue?

13       MR. SHERMAN:   Sup being a very generic term,

14    Judge, yeah, until we find out that there is

15    anything of "that stuff" that gets in, we would

16    include the objection.

17       THE COURT:   Very well.  State may proceed.

18                    (Witness sworn.)

19       THE COURT:   You may proceed, Mr. Ronkowski.

20       MR. RONKOWSKI:   Thank you.

21                 DETECTIVE JAMES CARLASSARE,

22    called as a witness on behalf of the People, having

23    been first duly sworn, was examined and testified

24    as follows:

                      X-5

C   163

1                    DIRECT EXAMINATION

2                    By Mr. Ronkowski:

3        Q.     State your full name and spell your last

4    name for the Court Reporter.

5        A.     Detective James Carlassare, C-a-r-l-a-s-

6    s-a-r-e, star number 21210, Area Two Detective

7    Division.

8        Q.     How long have you been with the Chicago

9    Police Department?

10       A.     Almost thirteen years.

11       Q.     Referring your attention to February

12   12th the year 2000 at about 6:30 p.m. did you have

13   an occasion to interview an individual who was in

14   custody?

15       A.     Yes, I did.

16       Q.     Who was that?

17       A.     He's the gentleman seated in the tan DOC

18   garb.

19       MR. RONKOWSKI:  May the Record reflect in-court

20   identification of the defendant?

21       THE COURT:    Record may reflect that.

22       MR. RONKOWSKI:  Where did this interview occur?

23       THE WITNESS:    It was in the Sixth District

24   police station.

                          X-6

1      Q.    Who was present?

2      A.    Just myself and the defendant.

3      Q.    Who spoke first?

4      A.    I did.

5      Q.    What did you do?

6      A.    I read him his Miranda warnings.

7      Q.    And was that from a preprinted source?

8      A.    That was from a preprinted card, yes.

9      Q.    Do you have your Miranda rights with you

10    today?

11     A.    I have them in a smaller, condensed

12    version.

13     Q.    Could you recite the rights that you

14    gave the defendant today in court in the same manner

15    you did at 6:30 p.m. on February 12th 2000?

16     A.    Without my reading glasses I'll attempt

17    to.  It should be not a problem.

18        MR. SHERMAN;  Judge, we're willing to stipulate

19    to the rights, that the rights that were given would

20    be in accordance with the Miranda decision.

21        MR. RONKOWSKI:  I'll accept that stipulation.

22        THE COURT:  Very well, I'll receive that

23    stipulation.

24        MR. RONKOWSKI:   Did the defendant also

X-7

C   165

1    indicate that he understood those rights?

2         THE WITNESS:    At the end of them he indicted

3    he did.

4         Q.    Did he give you a statement?

5         A.    Yes, he did.

6         Q.    What did he say?

7         A.    Not verbatim, he just stated that he

8    knew he was in a lot of trouble, he said he was in a

9    lot of trouble, he said he shouldn't have gone into

10   that apartment, he said that he was receiving help

11   at the rate of a hundred and fifty dollars an hour

12   for a problem that he had and that was basically it.

13        MR. RONKOWSKI:    No further questions.

14        THE COURT:    Cross-examine.

15                   CROSS EXAMINATION

16                   By Mr. Sherman:

17        Q.    Two questions. Investigator, you made a

18   report out of this incident, is that correct?

19        A.    Yes, I did.

20        Q.    And that report, according to what I

21   have here, was submitted on July 10th of the year

22   2000, is that correct?

23        A.    I don't recall.

24        Q.    Well, let me approach you and mark

                         X-8

C    166

1      Defendant's Exhibit Number 1, and ask what's the

2      date of submission to this report?

3          A.      Excuse me for a minute. This is a new

4      format. 12 July 2000 -- no, 10 July 2000.

5          Q.      From February 12th until July the 12th

6      -- well, strike that.

7                  Do you recall writing this report?

8          A.      Do I recall --

9          Q.      Authoring this report that I showed you.

10         A.      Vaguely, yes.

11         Q.      What did you use to refresh your memory

12     in July when you submitted this report?

13         A.      My GPRs.

14         Q.      And in your GPRs was there a statement

15     made by the defendant?

16         A.      Yes.

17         MR. SHERMAN:    Nothing further.

18         THE COURT:    Redirect?

19         MR. RONKOWSKI:  Not by the State.

20         THE COURT:    Thank you, Officer Carlassare. You

21     may step down.  Thank you for coming in, sir.

22                          (Witness excused.)

23         THE COURT:    State, you may call your next

24     witness.

X-9

1          MR. RONKOWSKI:  Want me to call my last witness

2     or do the bond hearing?

3          THE COURT:   Call the witness.

4          MR. RONKOWSKI:  Officer Meister.

5                    (Witness sworn.)

6          THE COURT:   Have a seat, sir.

7                    You may proceed, Mr. Ronkowski.

8          MR. RONKOWSKI:  Thank you.

9                    OFFICER WILLIAM MEISTER,

10    called as a witness on behalf of the People, having

11    been first duly sworn, was examined and testified

12    as follows:

13                    DIRECT EXAMINATION

14                    By Mr. Ronkowski:

15         Q.    State your full name, spell your last

16    name for the Court Reporter.

17         A.    Officer William Meister, M-e-i-s-t-e-r,

18    star number 15752.

19         Q.    How long have you been with the Chicago

20    Police Department?

21         A.    About ten and a half years.

22         Q.    Referring your attention to February

23    12th year 2000, in mid-afternoon hours did you have

24    occasion to respond to a call at 8234 South Eberhart

                         X-10

1    in the City of Chicago, County of Cook, State of

2    Illinois?

3        A.    Yes, I did.

4        Q.    And who did you meet with there?

5        A.    I met with the victim of a burglary.

6        Q.    Would that be Nora Elston?

7        A.    Yes, that's her name.

8        Q.    And describe briefly what you did the

9    first time you arrived there?

10        A.    She informed us that she believed that

11    somebody was attempting to break into the apartment,

12    and we went to the back, checked out the back yard,

13    checked out the back door, and we didn't find

14    anybody there and shortly thereafter we left the

15    scene.

16        Q.    Did you get a call to return?

17        A.    Yes, we did.

18        Q.    Did you return?

19        A.    Yes, I did.

20        Q.    How long was it that you were gone from

21    the time you left until the time you returned?

22        A.    I'd say it was approximately around five

23    minutes.

24        Q.    Did you meet with the victim again, Nora

X-11

C  169

1    Elston?

2          A.    Yes, I did.

3          Q.    Where did you meet with her?

4          A.    Out towards the front of the apartment

5    building.

6          Q.    Did she give you some information?

7          A.    Yes, she did.

8          Q.    Did you make a request of her?

9          A.    Yes. We asked her to get into our

10   vehicle and we began to tour the area for the wanted

11   offender.

12         Q.    And did you, in fact, tour the area?

13         A.    Yes, we did.

14         Q.    Did you find anybody?

15         A.    Yes, we did.

16         Q.    Where and when?

17         A.    Minutes after she got into our vehicle

18   she had pointed out the suspect, and that was on

19   Burnham about, I believe it was 8240 Burnham.

20         Q.    Would you be able to recognize the

21   individual that she pointed out that you saw if you

22   saw him again?

23         A.    Yes.

24         Q.    Is he in court?

1          A.     Yes, he is.

2          Q.     Would you point him out and identify him

3     today?

4          A.     The individual wearing the Department of

5     Corrections uniform.

6          MR. RONKOWSKI:  May the Record reflect in-court

7     identification of the defendant?

8          THE COURT:   Record may reflect that.

9          MR. RONKOWSKI:  After she pointed him out to

10    you what did you do?

11         THE WITNESS:   I exited the vehicle and had

12    noticed that he was carrying a black -- a small

13    black duffle bag.

14         Q.     Did you approach him?

15         A.     Yes, approached him, detained him and

16    then he exited a gangway out of -- I believe it was

17     510 West 83rd Street, and I relocated over to that,

18    to that gangway, and also found two plastic bags,

19    large plastic bags which contained quite a bit of

20    clothing in them.

21         Q.     The two plastic bags you found that

22    contained clothing, where did you find them?

23         A.     Those were in the gangway.

24         Q.     Same gangway that you saw the defendant

X-13

C   171

1      exit?

2          A.      That's correct.

3          Q.      How far did you find the bags from where

4      you found the defendant?

5          A.      It was -- it was in close proximity, it

6      wasn't that far.

7          Q.      Could you give us an estimate?

8          A.      I would have to guess maybe ten to

9      fifteen yards away.

10         MR. SHERMAN:  Objection to guessing, Judge.

11         THE COURT:   I'll overrule the objection.

12         MR. RONKOWSKI:  And how far was it?

13         THE WITNESS:   Ten to fifteen yards away.

14         Q.      What did you do with the two bags that

15     you found?

16         A.      I took them out of the gangway and

17     showed them to the victim.

18         Q.      What did she do?

19         A.      She looked inside the bag and stated

20     that those were her items inside the bag -- bags.

21         Q.      And what were the items that you found?

22         A.      Inside the duffle bag or the plastic --

23     the large plastic bags?

24         Q.      Let's start with the large plastic bag.

                         X-14

1          A.     It was as variety of different clothing.

2          Q.     And the small duffle bag that the

3    defendant had?

4          A.     There were CDs in that bag, there was

5    the victim's radio receiver and I think some

6    clothing as well in there.

7          Q.     The items in the small duffle bag, did

8    you also display them to the victim?

9          A.     Yes, I did.

10         Q.     And what did she do?

11         A.     She identified them, those items as

12   being hers.

13         Q.     Now, could you tell us the height and

14   weight of the defendant as you observed him back on

15   February 12th the year 2000?

16         A.     I would say he was around six foot tall

17   and approximately a hundred and eighty pounds.

18         Q.     And how big were the plastic bags that

19   you observed?

20         A.     They were large trash bags.

21         Q.     And do you recall the color?

22         A.     I believe they were gray.

23         MR. RONKOWSKI:  Nothing further.

24         THE COURT:    Cross-examine.

                          X-15

1                     CROSS EXAMINATION

2                     By Mr. Sherman:

3          Q.     Officer Meister, Ms. Elston, she

4    received those two large plastic bags because those

5    were her clothing?

6          A.     She received the plastic bags because

7    they were clothing?  I'm not sure I understand.

8          Q.     Did you give her back the two plastic

9    bags?

10         A.     Yes, I believe I did.

11         Q.     Because that was her clothing, correct?

12         A.     Correct.

13         Q.     And the black duffle bag that you said

14   the defendant had, what was the size of it?

15         A.     I would say it wasn't a very large bag,

16   maybe --

17         Q.     Something to carry on somebody's

18   shoulder?

19         A.     Yes, small enough to carry on the

20   shoulder, correct.

21         Q.     The size of this book?

22         A.     Little bit larger than that.

23         Q.     Something like about what, eighteen by

24   twenty, eighteen by eighteen or something?

                            X-16

1          A.      I would -- I would guess it was about

2     the size of that bag sitting there (indicating).

3          Q.      There (indicating)?

4          A.      Yes.

5          Q.      Okay. But it didn't have -- this is

6     about twenty by twelve?

7          MR. RONKOWSKI:  Yes.

8          MR. SHERMAN:  Okay.  And the defendant was

9     wearing it on his shoulder?

10         THE WITNESS:    Correct.

11         Q.      Okay.  And you said inside that bag was

12    a Topaz -- I'm sorry, Topaz receiver?

13         A.      That's the victim's radio receiver,

14    correct.

15         Q.      How big was that radio receiver?

16         A.      It was fairly small, it wasn't large,

17    more like almost like a clock radio.

18         Q.      And you also found a Sony Walkman and

19    some recorders, is that correct?

20         A.      I -- I think there was a Walkman and

21    there were CDs, compact disks.

22         Q.      Was that also inside that duffle?

23         A.      Yes, it was.

24         Q.      You also found miscellaneous clothing in

X-17

C   175

1    that duffle?

2        A.    Correct.

3        Q.    Was that clothing returned to the

4    victim?

5        A.    I don't recall if the clothing was

6    returned or not to her.  Most likely it was.

7        Q.    And the building was owned by the

8    victim, Nora Elston, is that correct?

9        A.    That's correct.

10       MR. SHERMAN;  Nothing further.

11       THE COURT:    Redirect?

12       MR. RONKOWSKI:  Not by the State.

13       THE COURT:    Thank you, Officer Meister.  You

14   can step down.

15                        (Witness excused.)

16       MR. RONKOWSKI:  State rests their case in

17   chief.

18       THE COURT:    State rests.  Defense?

19       MR. SHERMAN;  Defendant makes a motion for

20   directed finding at the close of the State's case as

21   to the charge of burglary.

22       THE COURT:    And you wish to argue?  Do you

23   wish to argue?

24       MR. SHERMAN:    No.

X-18

1          THE COURT:   The testimony of Ms. Elston on the

2     5th of June when the trial began was that she was in

3     her building at -- it was an apartment that was not

4     occupied, the apartment across the hall from her.

5     She had certain items of hers that were in there.

6               That at about 3:40 she was in her

7     apartment, she looked out, she saw an individual

8     coming up the walkway, heard the bell in that

9     apartment, which was located at 8234 South Eberhart,

10    heard that ring, and heard what sounded like a mail

11    box being pulled away.

12              She called the police at that time. The

13    individual left, police came and after they left she

14    heard some more sounds coming from the vacant

15    apartment. At this point she saw the person leaving

16    had some items in a plastic bag. She followed him

17    down an alley, the police came, she got in the car

18    with the police and about a block away saw the

19    defendant and identified the defendant to the police

20    officers.   She testified that the items that were

21    recovered from the bag, that the last time she saw

22    them they were in the vacant apartment.

23              There was testimony today of Detective

24    Carlassare as far as a statement made by the

X-19

1    defendant, where he knew he was in a lot of trouble,

2    shouldn't have gone into the apartment, he was

3    receiving help.  There was also testimony by Officer

4    Meister as to the recovery of the bags.

5            At this time, based on the evidence

6    presented in the State's case in chief the motion in

7    favor of the defendant is denied.

8        MR. SHERMAN:  Defense rests, your Honor.

9        THE COURT:   All right.  Mr. Daniels, you

10   understand that you have the right to testify at

11   trial. The decision as to whether or not you are

12   going to testify at trial is one that you make in

13   consultation with your attorney.

14           It's my understanding from your attorney

15   that you do not wish to testify at this time, is

16   that correct?

17       DEFENDANT DANIELS:  That's correct.

18       THE COURT:   Defense rests. Argument?

19       MR. RONKOWSKI:   Waive opening.

20       MR. SHERMAN:  No argument.

21       THE COURT:   Based on the testimony that I had

22   previously summarized, Ms. Elston testified to her

23   ownership of the apartment building and the vacant

24   apartment at the 34 address which she testified as

**X-20**

1     to the two observations she made, testified as to

2     her observation of the defendant who she pointed out

3     to the police and the items that he had in his

4     possession were items taken from the vacant

5     apartment.

6              At this time based on the totality of

7     the evidence that has been presented I believe the

8     State has sustained their burden of proof as far as

9     the charge of burglary.  Accordingly, there will be

10    a finding of guilty.

11         MR. RONKOWSKI:  Is the PSI in the other file

12    current enough, or does counsel wish an update?

13         MR. SHERMAN:  No  We'd like a 2-week date for

14    us to file a motion in arrest of judgment.

15         THE COURT:   Certainly.  The presentence

16    investigation is from March of this year.

17         MR. SHERMAN:  Certainly would be good enough

18    for us.

19         THE COURT:    Very well.  And what date do you

20    want, Mr. Sherman?

21         MR. SHERMAN:   Are you going to be here on the

22    14th of August?

23         THE COURT:   Yes, I am.

24         MR. RONKOWSKI:  I did the trial solo, and I

                            X-21

1    won't be.

2        MR. SHERMAN:  Okay.  Going to be here on the

3    12th?

4        MR. RONKOWSKI:  No, I'm going to be gone those

5    two weeks.  August 1st or 2nd?  Two weeks from today

6    is the 30th of July.

7        THE COURT:   July 30th?

8        MR. SHERMAN;  July 30th.  Judge, allow me to

9    tender you and the State copies of cases which I

10   believe should be instrumental in the motion of

11   arrest of judgment.

12       THE COURT:  Very well.  And I'll extend the

13   stay of mittimus on the matter --

14       MR. SHERMAN:  Please, Judge.

15       THE COURT:   (Continuing) -- to 7/30 as well.

16   Bond will be revoked on this matter.

17                        (Hearing in the above-entitled

18                         matter was continued to 7/30/02.)

19

20

21

22

23

24

                         X-22

C  180

STATE OF ILLINOIS      )
                       )  SS:
COUNTY OF C O O K       )


       I, THOMAS E. LIEF, Official Shorthand Reporter of the Circuit Court of Cook County, Criminal Division, do hereby certify that I reported in shorthand the evidence had in the above-entitled cause and that the foregoing is a true and correct transcript of all the evidence heard.


                           _____
                           Official Shorthand Reporter
                           #084-000501
                           Circuit Court of Cook County
                           Criminal Division
                           10/10/02

X-23

C  181

STATE OF ILLINOIS    )
                     )  SS:
COUNTY OF C O O K    )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE        )
STATE OF ILLINOIS,       )
                         )
          Plaintiff,     )
                         )
vs.                      )    No. 00 CR 07104
                         )
CHARLES DANIELS,         )
                         )
          Defendant.     )

REPORT OF PROCEEDINGS of hearing had

before the Honorable THOMAS M. DAVY, on the 30th day of

July, 2002.

APPEARANCES:

        HON. RICHARD A. DEVINE,
            State's Attorney of Cook County, by:
        MR. EDWARD RONKOWSKI,
            Assistant State's Attorney,

                appeared for the Plaintiff;

        MR. DENNIS SHERMAN,

                appeared for the Defendant.

Patricia A. Grogan, CSR 084-001450
Official Shorthand Reporter
10220 South 76th Avenue
Bridgeview, Illinois 60455

C  182

1    THE CLERK:  Charles Daniels.

2    MR. SHERMAN:  For the record, my name is Dennis Sherman.

3 I represent Charles Daniels who is present before the Court.

4    At this time, Judge, we filed a motion for new trial,

5 actually we're asking for a finding of not guilty after a

6 finding of guilty, Judge.

7    We did present to the Court cases and we did show them

8 to the State also.

9    THE COURT:  All right, both sides prepared to proceed on

10 the argument on the motion for new trial?

11    MR. RONKOWSKI:  State is.

12    MR. SHERMAN:  Defense is ready.

13    THE COURT:  You may proceed, Mr. Sherman.

14    MR. SHERMAN:  Well, Judge, the evidence in the case

15 showed that, proved that the Defendant went inside the

16 residence, seen inside that residence,  took something

17 inside of that residence and in fact left.  That he was not

18 charged with residential burglary.  He was charged with

19 burglary.

20    The cases that I've given you show that burglary and

21 residential burglary are one mutually exclusive.  They are

22 not a lesser included.

23    One of them said that the legislation intended

24 residential burglary statute apply to burglary of a

Y-2             C   183

1 structure intended for use as a residence regardless of

2 whether the structure was being actually used as a residence

3 at the time of the burglary.

4      That is People vs. Sexton, S-e-x-t-o-n.  You heard the

5 evidence this lady said I forgot either a four or six flat

6 building was occupied.  She lived there.

7      The people had moved out, but in fact there was no

8 testimony that she was doing that, this was not going to be

9 a dwelling place, therefore, we believe, Judge, also we

10 bring up Swain, S-w-a-i-n, also said which was a

11 nonoccupied second floor of the building which was under

12 going renovation was a dwelling place, here there was no

13 renovation going on, just vacant, Judge.

14      We believe Judge, not that the State proved the

15 Defendant guilty not of  burglary, but of residential

16 burglary since it is not a lesser included since they are

17 mutually exclusive.

18      The burglary cannot stand.

19      THE COURT:  Thank you, Mr. Sherman.  Mr. Ronkowski,

20 response?

21      MR. RONKOWSKI:  State would object to paragraph four,

22 lack of specificity.  As to Counsel's specific argument

23 today,  the State probably could argue, People vs.

24 Edelston, the case said the identical issue in the 2nd

C  184

1 District said the State called on which charge either way

2 was denied on that or the State can argue, the statutory

3 construction based upon the case is that Counsel has cited

4 where they interpreted the statute at the time that some how

5 a dwelling building, a home, is not a building.

6       It is like the Illinois Supreme Court saying that a cow

7 is a horse.  In fact, if you look at the statute, the

8 statute  has since been changed to correct that mistake and

9 that is no longer in there, but rather than argue those two

10 things, I would argue that the statutory definition of

11 dwelling that was in affect at the time the crime indicated

12 that a dwelling is a building even if the persons are not

13 actually residing there, if "absence is intended within a

14 reasonable period of time to reside."

15       Based upon the testimony of the victim, she didn't

16 live there.  She lived across the hall.  She never intended

17 to live in that apartment next door.

18       She owned the building. There is no testimony that any

19 owner intended to reside in that vacant apartment within

20 any reasonable period of time.

21       The testimony shows quite squarely that the Defendant

22 committed a burglary within the meaning of the statutory

23 definition that existed at the time of the crime.

24       So, based upon the testimony in the statute in

C  185

1 existence at the time, the Defendant quite clearly committed

2 a burglary and the Defendant's motion for new trial should

3 be denied.

4     MR. SHERMAN:  Judge, I think I guess they're citing 720

5 ILCS which says for residential burglary, a dwelling defines

6  a house, apartment, mobile home, trailer or other living

7 quarters in which at the time of the alleged offense the

8 owners or occupants actually resides, this woman did reside

9 in this building.

10     The apartment maybe one, but she says she saw this man

11 come inside this building.  This building is a residence.

12 She also said that in fact though there was nobody living

13 in the apartment that was next door to it, there was

14 nothing saying that she wasn't going to rent it out.

15 Nothing saying it was not going to be used as a residence,

16 so I believe, Judge, that in fact this was a residential

17 burglary, pure and simple and the State argues, I don't

18 think it goes to the fact that these two charges, burglary

19 and residential burglary are mutually exclusive.

20     They are not a lesser included and I believe, Judge, if

21 they're not a lesser included, then you should have found

22 the Defendant not guilty of burglary at the time.  Thank

23 you.

24     THE COURT:  Mr. Ronkowski, the definition you have for

1    Defense Counsel could not make that argument today

2 because the statute has been changed so that in affect calls

3 into question the Childress decision.

4    THE COURT:  What, the residential?

5    MR. RONKOWSKI:  Took out the offending language that

6 Counsel quotes about the charges being mutually exclusive.

7    Under current statute, specifically, the statute now

8 reads under residential burglary, this offense includes

9 the offense of burglary as defined under 19-1 that is

10 currently in the statute.

11    THE COURT:  When did that take affect?

12    MR. RONKOWSKI:  Makes no difference because--

13    THE COURT:  Why doesn't it make a difference, you can't

14 be charged with something in the statute in affect is the

15 one that was in affect on the date of the incident?

16    MR. RONKOWSKI:  What the Illinois legislature is

17 saying, if the Illinois Supreme Court misinterpretes are

18 intent, we're going to make it quite clear what our intent

19 was, but you don't even get to Childress.  It is strictly

20 what the law was at the time.

21    THE COURT:  What was the law at the time?

22    MR. RONKOWSKI:  The law at the time was if I could have

23 these back, if no owner intended to occupy that apartment

24 within a reasonable period of time, it is not a dwelling.

C  187

1 It is not a dwelling.  It is a building and the owner of the

2 building did not intend to occupy that apartment.  She lives

3 next door.  It is an issue of statutory interpretation.

4     If she had leased that apartment out and the people

5 weren't home at the time, Counsel may have an argument, but

6 the owner testified I own the building, nobody was living in

7 that apartment.

8     It was vacant.  It is being renovated and falls clearly

9 within the provision where there is no owner intending to

10 occupy that vacant unit at the time.

11     So, you don't even get to the Childress decision.

12     MR. SHERMAN:  Judge, the charge against the Defendant

13 is that he without authority knowingly entered into the

14 building the property of Nora Elston, not an empty

15 apartment, but a building.  A building in which Nora Elston

16 owned and lived.

17     I find it hard to believe that is not a dwelling.  The

18 fact is there maybe a vacant apartment in that building

19 doesn't mean that if the Defendant goes inside that

20 building, it is owned with the intent to commit a theft.

21 That is residential burglary if somebody lives there and

22 Nora Elston did live there.

23     THE COURT:  Well, the case I think is directly on point

24 is People vs. Maskell, 304, Ill.App.3rd, 877, 1999 2nd

1 District case which discusses the Childress case which I

2 think had the Defendant been charged with the entry into a

3 specific apartment would still apply since there are

4 numerous cases that say a building is a dwelling if going to

5 intent to be used as a dwelling regardless of who would be

6 living there.

7      In any case, the Maskell case, it involved an apartment

8 building and one of the witnesses observed the Defendant

9 taking the TV set, pushing the TV set down the stairs of the

10 building that was entered through the front door and then

11 into the families apartment.

12     The Maskell case, page 84, unlike Childress and Borgen,

13 the  evidence in this case will allow the rational trier of

14 the fact find the Defendant made two unauthorized enteries.

15     These unauthorized enteries,  one into the building,

16 two in the apartment.  Moreover, the State does not dispute

17 that the stairwell of the building, the area of the

18 building that the Defendant entered when he entered the

19 building was not a dwelling place.

20     In this particular case, the testimony of Ms. Elston

21 was that she heard some noises at the entryway.  The

22 entryway, there was a common entryway into the apartment

23 where the mailboxes were at.

24     Entry was made apparently through there and through

Y-9

C  189

  
1 that area the Defendant then entered the particular vacant

2 apartment.

3      So, I think under Maskell case in an apartment building

4 case unless the evidence would be that someone entered

5 directly into a particular apartment through a window or a

6 door leading directly from that apartment, from outside into

7 the apartment that as long as there is common area hallway,

8 stairway, or whatever, that entry into that building into

9 that common area would sustain the charge of burglary.

10      So, at this time, respectfully, motion for new trial is

11 denied.  I believe the parties agree we're going to proceed

12 on the presentence investigation was tendered on March 7th.

13      MR. RONKOWSKI:  Correct.

14      MR. SHERMAN:  Correct.

15      THE COURT:  Both sides prepared to proceed to

16 sentencing at this time?

17      MR. SHERMAN:  Yes.

18      MR. RONKOWSKI:  Yes.

19      THE COURT:  State, aggravation.

20      MR. RONKOWSKI:  Aggravation is listed quite eloquently,

21 in all of the Defendant's previous residential burglary

22 convictions in the PSI, Class X by priors and last sentence

23 of twelve years wasn't enough for him, the State would

24 recommend fifteen years mandatory consecutive.

1    THE COURT:  Was this last sentence I just imposed a
2 couple months ago?

3    MR. RONKOWSKI:  I think that is.

4    THE COURT:  So, Mr. Daniels really had no chance to see
5 if that would make an impression.

6    MR. RONKOWSKI:  Well, Mr. Daniels is the one committing
7 the crimes.

8    THE COURT:  Not between that sentence and today's
9 sentence?

10    MR. RONKOWSKI:  I would hope the Court would impress
11 upon the Defendant increasing the severity on his crimes
12 that is just the State's position.

13    THE COURT:  Mitigation.

14    MR. SHERMAN;  Judge, you have heard in itigation, the
15 Defendant does have a drug habit.  He is a person that
16 graduated from college, but for the drugs, he was working
17 prior to getting involved in crimes.

18    As you know, he was not on bond.  I think he was on
19 daily reporting when this occurred.  Obviously, has a drug
20 habit and it is too bad we can't try and deal with that
21 drug habit rather than  warehousing somebody whose habits
22 are not going to change simply by being incarcerated.

23    We should have learned that a long time ago, Judge.
24 That is all I have to say.

1    THE COURT:  Mr. Daniels, anything you wish to say before

2 I impose the sentence?

3    MR. DANIELS:  Yes, sir, your Honor, good morning, your

4 Honor, one point if I can, you indicated something to the

5 affect that just a moment ago about a window and the

6 testimony, I don't have the transcript, but this lady

7 indicated I came in through a window which in fact was the

8 reason why you differentiate these two cases or several

9 cases, but as far as you know, I'm in a catch 22--

10    THE COURT:  Yes, you are, Mr. Daniels because you

11 didn't testify during the course of the trial and I have

12 the evidence that I heard from Ms. Elston was sounded like

13 a mailbox being pulled away.

14    MR. DANIELS:  I ask you to have mercy.  I did not

15 anticipate this was not my normal behavior at the time of

16 the offense.  I was doing drugs, but these allegations I

17 can't do anything about that except long for the future.

18    I would ask you give me an opportunity. I have two

19 daughters that I would like to at least be able to see.

20 I've been before you just a few months ago with the same

21 situation.

22    All I would ask you have mercy on me, so I can at least

23 try and rehabilitate and become a member of society

24 sometime in the near future.

1    THE COURT:  Thank you, Mr. Daniels.  I've considered the

2 testimony that has been presented during the course of the

3 trial, I've considered the Defendant's background as set out

4 in the presentence investigation.  The Defendant received in

5 1981 a three year probation sentence for the offense of

6 burglary.  Also, a federal arrest in 1984, eleven months

7 fifteen days in jail, 1982, four years Illinois Department

8 of Corrections for the offense of residential burglary,

9 1986, four years on burglary charges, four years concurrent

10 sentence is consecutive sentence rather Illinois Department

11 of Corrections, 1993, the Defendant was sentenced to ten

12 years Illinois Department of Corrections.  The Defendant

13 was sentenced to a sentence of twelve years in the Illinois

14 Department of Corrections for the offense of residential

15 burglary by me in April of this year after a plea of guilty

16 on that charge.

17    The Defendant had also submitted at the time of the

18 sentencing on the plea, which I will consider at this point

19 as well as certain materials as to his drug problems.

20    The presentence investigation makes reference to

21 certain psychological problems Mr. Daniels has had as well

22 as the drug problems that he has never been treated for

23 drug abuse.

24    I don't think that it is necessary for the Courts to be

C   193

1 the only intervening factors in terms of people getting help

2 for their drug abuse problem.  Something that has lasted

3 apparently over a long period of time.

4      The legislator closed what apparently was a gap in

5 terms of treatment, so someone who is now a Class X offender

6 cannot get TASC pretty well closed as far as who can get

7 TASC for offenses and became affective about a year ago in

8 August, the legislature changed the law, so someone with a

9 Class sentence could no longer get TASC, so at a certain

10 point, I suppose the Defendants are going to have to admit

11 to the Courts they have drug problems.

12      Having considered all the factors in aggravation and

13 mitigation, having considered what would be an appropriate

14 sentence for Mr. Daniels, having considered that the

15 offenses that he has been charged with, having been  non-

16 violent offenses, at this time on the offense of burglary

17 with a Class X sentence range 00CR7104 because you were on

18 pretrial release on the other case and mandatory sentence

19 must be imposed and I'm going to impose a sentence of eight

20 years in the Illinois Department of Corrections consecutive

21 to the twelve year sentence in 99CR9919 case.

22      I would also advise you Mr. Daniels that you do have a

23 right to appeal both the cases I found you guilty on and

24 the sentences that I have given you.

C   194

1    If you wish to raise the issue of sentence on appeal,
2 you must first file a motion for me to reconsider that
3 sentence.  That must be done within thirty days of today's
4 date.  It has to be in writing why I should reconsider the
5 sentence.

6    Any reason not set out in the written motion to
7 reconsider the sentence cannot be used on appeal.

8    If you do not have the money to hire a lawyer or get a
9 copy of the Court Reporter transcript that would be provided
10 if the motion was allowed, I would then resentence you.  If
11 I deny that motion, you would have thirty days to file a
12 Notice of Appeal.

13    If you don't file a Notice of Appeal or motion to
14 reconsider sentence within thirty days of today's date, you
15 have thirty days from today to file a Notice of Appeal.

16    In either case as far as the filing of the Notice of
17 Appeal that must be done within thirty days of today's date
18 or within thirty days of when I rule on the motion to
19 reconsider sentence.

20    If you need assistance from the Clerk's Office that
21 would be provided and if you were without funds to hire a
22 lawyer or get a copy of the Court reported transcript that
23 would be provided as well.

24    So, do you understand you have those rights as well,

C   195

1 Mr. Daniels?

2   MR. DANIELS:  Yes, sir.

3   THE COURT:  Anything further by either side?

4   MR. SHERMAN:  I see eight-hundred and ninety-seven days

5 since his arrest.

6   MR. RONKOWSKI:  Consecutive sentence.  Time-served only

7 applies on the first one and the mittimus should have

8 reflected all the credit.

9   MR. SHERMAN;  That was on April 16th so, April 16th to

10 today's date, Judge that would be at least another seventy-

11 seven and some days.  He got sentenced April 16th for

12 twelve years.

13   THE COURT:  Correct.

14   MR. SHERMAN:  April 16th, July 30th, he should get

15 credit for that in this case.

16   MR. RONKOWSKI:  You don't get credit on consecutive,

17 only get it on the first one.

18   THE COURT:  Basically, the sentences are added together

19 to come up with a total of twenty years total amount of

20 time Mr. Daniels has been in custody.

21   MR. SHERMAN:  What kind of date are we going to put

22 down?

23   THE COURT:  Do you know how many days credit he had on

24 the 1999 case?

C   196

1    MR. SHERMAN:  I thought seven-hundred and eight-six, I
2 can't be sure, looks like seven-hundred and eighty-six.

3    THE COURT:  At the date of sentencing?

4    MR. SHERMAN:  Date of sentencing.

5    THE COURT:  It would appear, he could get more in
6 custody on that one than --

7    MR. DANIELS:  It is twelve-hundred days.

8    THE COURT:  Why don't I pass it and if you want to
9 count.  I know you have a couple --

10    MR. SHERMAN:  The date of April 16th to the present is
11 that the date?

12    THE COURT:  What I'm looking for is the total number of
13 days Mr. Daniels has been, twelve years and eight years
14 will be added together to come up with the twenty year
15 sentence.

16    MR. SHERMAN:  Eight-hundred and ninety-seven days from
17 April 12th, I will figure it out.  Does it say on the other
18 case?

19    THE COURT:  I don't think we have calculated because of
20 this case.

21    MR. RONKOWSKI:  Had the mittimus issued in the other?

22    THE COURT:  Mittimus had been stayed.

23    MR. RONKOWSKI:  Then Counsel is correct to figure out
24 the corrected mitt goes o the first case, but everything up

1 to today, we can pass it and compute that.

2    THE COURT:  The lawyers perhaps together can come up
3 with the sentence credit.  Once that is resolved, the
4 mittimus will issue on both matters.

5    (Case passed and later recalled.)

6    THE CLERK:  Daniels.

7    THE COURT:  On the record, on Charles Daniels, Mr.
8 Sherman although there is going to be a stay of mittimus on
9 Mr. Daniels two cases here because he has a bench trial. If
10 I ship, if I order the mittimus to issue, probably be
11 shipped down to the Department of Corrections, so I will
12 stay the mittimus to the 26th of September.  You have
13 calculated the time credit?

14    MR. SHERMAN:  Yes, twelve-hundred and three days.  From
15 April 15th of 1999 until July 30th of 2002.

16    THE COURT:  On the date the mittimus does issue, I will
17 have that on there.

18    MR. SHERMAN:  You said something--

19    I believe it is not correct, I believe  you have to
20 file a motion to reconsider sentence.

21    THE COURT:  Within thirty days.

22    MR. SHERMAN:  Prior to filing a Notice of Appeal and if
23 you don't file the motion--

24    THE COURT:  I thought that is what I was trying to tell

1 him.

2      MR. SHERMAN:  I thought I know the motion to reconsider
3 is only on the sentence, but I think you have to file it
4 before you get jurisdiction to go to the Appellate Court?

5      THE COURT:  Right.  I thought I had told him he had
6 thirty days to file a motion to reconsider.

7      MR. SHERMAN:  Then you said if--

8      THE COURT:  If he doesn't file that, if he decides to
9 file not the motion to reconsider, he has thirty days.

10      MR. SHERMAN:  If you don't file the motion to
11 reconsider sentence, I don't think you have, I think that
12 is the first step you have to file that before the
13 Appellate Court will get any jurisdiction if you just file
14 a Notice of Appeal, they won't listen.

15      THE COURT:  Right.

16      MR. SHERMAN:  Or anything.

17      THE COURT:  Well--

18      MR. RONKOWSKI:  Judge, he is just trying to get you to
19 help him reverse yourself.  Don't answer any moot
20 questions, he will use it against you.

21      MR. SHERMAN:  He is good, isn't he?

22      THE COURT:  Okay, off the record.

23  (A discussion was had, off the record, between the Court
24 and Counsels, after which the following Proceedings were

Y-19

1 had:)

2     Back on the record.  That is all.

C   200

STATE OF ILLINOIS    )
                     )    SS.
COUNTY OF C O O K    )


            I, Patricia A. Grogan, Official

Shorthand Reporter of the Circuit Court of Cook County,

County Department-Criminal Division, do hereby certify that I

reported in shorthand the proceedings had in the above-

entitled cause, that I thereafter caused to be transcribed

into typewriting the above Report of Proceedings, which I

hereby certify is a true and correct transcript of the

proceedings before the Judge of said Court.

            Official Shorthand Reporter
            Circuit Court of Cook County
            084-001450

Y-21

C    201